# United States Court of Appeals
# for the Federal Circuit

---

**THE OHIO WILLOW WOOD COMPANY,**
*Plaintiff-Appellant*

**v.**

**ALPS SOUTH, LLC,**
*Defendant-Cross-Appellant*

---

2015-1132, 2015-1133

---

Appeal from the United States District Court for the Southern District of Ohio in No. 2:04-cv-01223-GLF-MRA, Judge Gregory L. Frost.

---

Decided: February 19, 2016

---

JOHN DAVID LUKEN, Dinsmore & Shohl LLP, Cincinnati, OH, argued for plaintiff-appellant. Also represented by JOSHUA A. LORENTZ, BRIAN S. SULLIVAN.

RONALD A. CHRISTALDI, Shumaker, Loop & Kendrick LLP, Tampa, FL, argued for defendant-cross-appellant. Also represented by MINDI M. RICHTER, DAVID WAYNE WICKLUND, Toledo, OH.

---

Before DYK, BRYSON, and WALLACH, *Circuit Judges.*

BRYSON, *Circuit Judge.*

This case marks the latest chapter in a long-running dispute between two manufacturers of prosthetic limb accessories. The appellant, The Ohio Willow Wood Company ("OWW"), owns a group of patents directed to cushioning devices that fit over the residual stumps of amputated limbs to make the use of prosthetics more comfortable. OWW has asserted its patents against defendant Alps South, LLC ("Alps") in several actions.

The cushioning devices at issue in this case consist of stretchable pieces of synthetic fabric that are coated with a gel on only the side touching the body. That design creates a gel side that reduces irritation to the skin and a dry side that allows free interaction with the prosthesis.

I

This case is back before us following an earlier decision remanding a portion of the case for trial. *See Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333 (Fed. Cir. 2013). The facts and legal issues that we addressed then are similar to those presented in this appeal, so we offer an abbreviated version of the background facts, focusing mainly on the analysis of the district court's findings of fact and conclusions of law in the remand proceedings.

A

OWW filed the present action in 2004, charging Alps with infringement of U.S. Patent No. 5,830,237 ("the '237 patent"). After the district court issued a claim construction order, Alps challenged the validity of the '237 patent in two successive ex parte reexamination proceedings before the Patent and Trademark Office ("PTO"). The district court stayed the litigation pending the resolution of the reexamination proceedings.

The first reexamination, initiated in 2006, focused on advertisements for a prior art cushioning device called the Silosheath, which was made by Silipos, Inc., one of OWW's competitors. The Silosheath consisted of a sheath made of nylon fabric with gel material on the inner side. The examiner initially rejected all the challenged claims of the '237 patent based on the Silosheath prior art. OWW overcame the rejection by showing the examiner a Silosheath product in which the gel on the inner or skin side of the liner had bled through to the outer or prosthetic side. The examiner then allowed OWW to amend its claims to clarify that the gel coating was found only on the inner side of its claimed device and issued a reexamination certificate.

In 2008, shortly after the completion of the first reexamination, Alps initiated a second reexamination. The new request for reexamination was based on an advertisement in a trade magazine published on January 1, 1995, which depicted a gel liner identified as the Single Socket Gel Liner ("SSGL"), from Silipos's "Silosheath product line." Alps argued that the SSGL was invalidating prior art because it had gel on its inner surface, but not on its outer surface. The central issue in the second reexamination was whether the synthetic fabric used in the SSGL prevented the gel on the skin side of the liner from bleeding through to the prosthetic side.

In addition to the advertisement, Alps presented a declaration and deposition testimony from Jean-Paul Comtesse, who worked at Silipos when the Silosheath and the SSGL were developed. Mr. Comtesse stated that the SSGL did not have the same gel bleed-through problem as the Silosheath because it was manufactured from a fabric called "Coolmax" that was thicker and denser than the fabric used in the Silosheath. Alps argued that, in light of the prior art evidence and Mr. Comtesse's testimony, it was clear that the amended claims were invalid.

The examiner agreed with Alps and rejected the claims of the '237 patent for obviousness in light of the SSGL and other prior art. OWW appealed the rejection to the Board of Patent Appeals and Interferences ("the Board"). In its brief to the Board, OWW argued that Mr. Comtesse's testimony was unreliable because it was uncorroborated and because Mr. Comtesse was a highly interested witness. As to Mr. Comtesse's interest in the case, OWW argued that he was the inventor of the SSGL and that he continued to receive royalties on that product. As to the absence of corroboration, OWW argued that aside from Mr. Comtesse's testimony the only evidence relating to the SSGL was the 1995 advertisement, which contained no reference to Coolmax. According to OWW, there was "no other evidence of any sort in this regard," and because "the Comtesse testimony is not corroborated as required it cannot be properly used to cure the very deficiencies in the [1995 advertisement] for which corroboration is lacking."

In oral argument before the Board, OWW pressed its contention that there was no evidence corroborating Mr. Comtesse's testimony about the SSGL. OWW also continued to argue that Mr. Comtesse was an interested witness, asserting that he was an inventor of the SSGL and was still receiving royalties from Silipos's sales of that product.

The Board reversed the examiner's rejection. The Board agreed with OWW that Mr. Comtesse's testimony was uncorroborated and that he was an interested third party. Based on those conclusions, the Board held that the examiner had erred in crediting Mr. Comtesse's testimony that the SSGL was made of Coolmax and had gel on only its inner side.

## B

Following the second reexamination, the district court lifted the stay of the litigation. The court then granted

Alps's motion for summary judgment of invalidity as to all the asserted claims of the '237 patent. The court invalidated some of the claims based on the collateral estoppel effect of a decision against OWW in a case from a different district court. It invalidated the remaining claims for obviousness based on the Silosheath, the SSGL, and other prior art references. The court also addressed Alps's inequitable conduct claim, which was predicated on OWW's conduct before the PTO during the two reexamination proceedings. As to that claim, the court granted summary judgment to OWW, holding that there was no triable issue of inequitable conduct on OWW's part.

## C

Both sides appealed. This court affirmed the summary judgment of invalidity. With respect to inequitable conduct, however, we concluded that the case presented genuine issues of material fact. Accordingly, we reversed the summary judgment of no inequitable conduct and remanded the case to the district court for trial. *Ohio Willow Wood Co.*, 735 F.3d 1333.

We noted that "OWW was only able to obtain issuance of the '237 patent in the reexamination proceedings by arguing that the prior art lacked gel liners with no observable gel material on their exterior surfaces." *Id.* at 1345. In the second reexamination, we added, "OWW was only able to overcome the examiner's final rejection in view of the SSGL by convincing the [Board] that Mr. Comtesse was a highly interested witness and there was no evidence, as required by law, to corroborate his testimony that the SSGL was constructed using a Coolmax fabric." *Id.* at 1346.

As to corroboration, we stated that the evidence as a whole provided "consistent and convincing evidence that corroborates Mr. Comtesse's testimony regarding the structure of the SSGL prior to [the '237 patent's critical date of] March 5, 1995." *Id.* at 1349.

As to whether Mr. Comtesse was an interested witness, we agreed with the district court that OWW had misrepresented Mr. Comtesse's testimony to the Board. We stated that Mr. Comtesse "never admitted that he was interested in the outcome of the present dispute nor did he ever admit that he was receiving royalty payments at the time of his deposition in 2006."[1] *Id.* at 1349.

Finally, with respect to the issue of intent, we stated that "OWW withheld various pieces of material information and had no reasonable explanation for the several misrepresentations it made to the PTO." *Id.* at 1351. The collective weight of the evidence, we concluded, "would support a finding of intent that is the single most reasonable inference to be drawn from the evidence at this stage of the proceedings." *Id.*

D

On remand, the district court held a three-day bench trial on the inequitable conduct issue. Following the trial, the court issued a lengthy opinion finding inequitable conduct in the second reexamination, but not in the first. The inequitable conduct in the second reexamination, the court found, arose from the conduct of James Colvin, OWW's Director of Research and Development, who was responsible for overseeing the Alps litigation for the company.

OWW used the same law firm for both the litigation and reexamination proceedings in this case. The firm established an ethical screen to separate the attorney handling OWW's reexamination proceedings from the attorneys handling OWW's litigation matters. With the creation of the screen, Mr. Colvin became the connection

---

[1] OWW's reexamination counsel has since admitted that his statement regarding the payment of royalties to Mr. Comtesse was incorrect.

between OWW's litigation and reexamination counsel. The district court found that, with occasional exceptions, Mr. Colvin was the ultimate decision maker with respect to some of OWW's patent litigation matters, including this case. The court also found that Mr. Colvin had reviewed filings and attended hearings in both the litigation and the reexamination proceedings, and that Mr. Colvin was sophisticated with respect to patents and patent prosecution, as he had overseen the prosecution of about 30 patents and was an inventor on about 20 patents. Mr. Colvin testified that, although he understood that he was the person "in the middle," he did not send OWW's reexamination counsel "all information . . . regardless of how important it might have been." Instead, Mr. Colvin explained that he sent OWW's reexamination counsel only "whatever he requested or I thought was appropriate."

The district court ruled that Mr. Colvin engaged in inequitable conduct during the second reexamination of the '237 patent based on a series of factual findings regarding whether Mr. Comtesse's testimony was uncorroborated. The court found (1) that Mr. Colvin was aware that OWW's reexamination counsel had represented to the Board that Mr. Comtesse's testimony was entirely uncorroborated; (2) that Mr. Colvin was aware of materials that corroborated Mr. Comtesse's testimony; and (3) that Mr. Colvin failed to correct his counsel's misrepresentations.

The items the court identified as corroborative of Mr. Comtesse's testimony included a pair of letters sent to OWW in April and October of 1999 by Michael Scalise, an attorney for Silipos ("the Scalise letters"). The first of the Scalise letters stated that Silipos had sold the "SiloSheath product line" since "at least as early as 1992" and that one of the products in that line "contained the polymeric gel on only the inside of the sock." That letter concluded that Silipos's "original sales of their SiloSheath tube-shaped

sock product line having the gelatinous materials on only the inside of the sock pre-date the filing date" of the '237 patent. The letter also enclosed a 1994 patent application amendment for the Silosheath product line that disclosed a protective garment having "an inner layer comprising a gel."

The second Scalise letter claimed that Silipos's sale of liners "having the gelatinous material on only the inside of the sock pre-date the filing date of [the application that became the '237 patent] by more than one year." Attached to the letter was a November 1, 1993, shipping invoice that the letter claimed was for one of the Silipos products with gel on only one side.

OWW did not disclose the Scalise letters to its reexamination counsel, and the letters were not disclosed to the PTO in the course of either reexamination. The district court found that Mr. Colvin was aware of the Scalise letters and that the letters were corroborative of Mr. Comtesse's testimony. For that reason, the court ruled, the letters became material when OWW contended that Mr. Comtesse's testimony was uncorroborated.

The district court also found that Mr. Colvin had knowledge of three declarations that were attached to Alps's 2006 summary judgment motion in the district court litigation. The declarants stated that Silipos had offered the SSGL product prior to January 1, 1995, and that the SSGL had no gel on the exterior of the liner and no bleed-through, as was the case with some of the Silosheath products. One of the three declarants stated that he had fitted a patient with the SSGL, which used a substantially thicker fabric than the Silosheath, and as a result did not allow the gel to pass through to the exterior of the liner.

The court found that the Board accepted as true OWW's representation that Mr. Comtesse's testimony was

uncorroborated. The court further concluded that "absent OWW's misrepresentations that no corroborating evidence existed, the [Board] would not have reversed the Examiner and reinstated the '237 patent." The court's finding mirrored the Board's opinion that "the dispositive issue in this appeal is . . . [the] testimony of [Mr. Comtesse] in support of the rejections."

Moving to the issue of intent, the district court found that the evidence was sufficient to infer deceptive intent on the part of Mr. Colvin and OWW's reexamination counsel. While the court was not persuaded that deceptive intent was the single most reasonable inference to draw from the evidence with respect to reexamination counsel, it reached the opposite conclusion with respect to Mr. Colvin.

The court found that Mr. Colvin was deeply involved in both the reexamination proceedings and the infringement litigation, and that he knew about various items bearing on the inequitable conduct allegations. The court therefore found that Mr. Colvin was in a position to correct the misrepresentations regarding the evidence corroborating Mr. Comtesse's testimony, but did not do so. In particular, the court found that Mr. Colvin was aware of the Scalise letters and the 2006 declarations. The court rejected as not credible Mr. Colvin's testimony that he had never seen the 2006 declarations because he was barred from seeing them by the protective order entered in the district court case.

As to the Scalise letters and the Silipos patent application referred to and attached to one of the letters, the district court noted that Mr. Colvin "had no explanation for his failure to present those documents to either [OWW's prosecution counsel] or the PTO." The court therefore held that "the most reasonable inference to be drawn from the evidence is that OWW acted with decep-

tive intent in misrepresenting the existence of evidence corroborating the Comtesse testimony."[2]

Based on its inequitable conduct finding, the district court held the '237 patent unenforceable, found the case to be exceptional, and imposed a fee award against OWW. The fee award required OWW to pay Alps's attorneys' fees incurred in litigating this case after September 30, 2011, the date of the Board's decision on the second reexamination.

Alps also requested that the district court extend its holding that the '237 patent was unenforceable to three other related patents owned by OWW, U.S. Patent Nos. 6,964,688, 7,291,182, and 8,523,951. The court denied that request. It noted that Alps had not requested that relief in its counterclaim and that "Alps' arguments regarding the similarity of the [three related OWW patents] go beyond the scope of evidence presented in this case."

## II

OWW argues that the district court erred in finding that OWW, through Mr. Colvin, was guilty of inequitable conduct during the second reexamination.

A party seeking to prove inequitable conduct must show by clear and convincing evidence that the patent

---

[2]     The court credited Mr. Colvin's statement that he was unaware that Mr. Comtesse had testified that he was not currently receiving royalties for the SSGL. Accordingly, the court found that the evidence did not show that Mr. Colvin knew that his reexamination counsel's statements to the Board about Mr. Comtesse's royalties were false. For that reason, the court held that Mr. Colvin did not commit inequitable conduct in misrepresenting the issue of royalties to the PTO.

applicant made misrepresentations or omissions material to patentability, that he did so with the specific intent to mislead or deceive the PTO, and that deceptive intent was the single most reasonable inference to be drawn from the evidence. *Ohio Willow Wood*, 735 F.3d at 1344; *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011) (en banc). On appeal, we review the district court's findings of fact on the issues of materiality and intent for clear error. *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185, 1189 (Fed. Cir. 2014) (citing *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1342 (Fed. Cir. 2013)). We review the district court's ultimate finding of inequitable conduct based on those underlying facts for an abuse of discretion. *Id.*

A

To prove the element of materiality, a party claiming inequitable conduct ordinarily must show that the patentee "withheld or misrepresented information that, in the absence of the withholding or misrepresentation, would have prevented a patent claim from issuing." *Ohio Willow Wood*, 735 F.3d at 1345; *Therasense*, 649 F.3d at 1291.

The district court acknowledged that the Scalise letters did not "conclusively answer" the questions whether the SSGL was on sale before the critical date of the '237 patent and whether the SSGL had gel only on the inside of the liner. However, the court explained that the significance of that evidence was not that it conclusively proved that an anticipating device was on sale before that date, but that it corroborated Mr. Comtesse's testimony to that effect.

Mr. Comtesse testified that the SSGL depicted in the January 1, 1995 advertisement represented invalidating prior art having gel only on the inner side. The assertion in the Scalise letters that Silipos sold a product "with

gelatinous material on only one side" prior to March 5, 1995, corroborates Mr. Comtesse's testimony.[3]

The district court found that the withheld evidence became "but-for" material to patentability in the second reexamination once OWW argued to the Board that Mr. Comtesse's testimony was uncorroborated. That finding is well supported in light of the Board's focus on the existence of corroborating evidence as the dispositive issue in the case and its acceptance of OWW's representations that no corroborating evidence existed.

OWW argues that the Scalise letters were not material because they referred to the Silosheath, not the SSGL. In fact, however, the letters used the term "Silosheath" not to refer to a single product, but to refer to a line of products ("the Silosheath product line"), which included one product containing gel on only one side. The use of the term "Silosheath product line" to include the SSGL is reflected in January 1, 1995, advertisement, which refers to the SSGL in connection with the "Silosheath product line."

OWW also argues that Silipos used the term Silosheath to refer to products with a thin nylon sheath, not the thicker fabric found in the SSGL, which was referred to as a "liner." Again, the Scalise letters undermine that

---

[3] In addition to the substance of the assertions contained in the Scalise letters, the fact that they were sent approximately five years before the litigation commenced and more than seven years before Mr. Comtesse was deposed is significant, as the letters would have undercut OWW's contention that Mr. Comtesse's testimony about the SSGL was influenced by the litigation and was unreliable because of the years that had passed since the events in question.

argument; the second Scalise letter refers to "various Silosheath tube-shaped sock products," including the "Silosheath Prosthetic Liner," sold before the critical date of the '237 patent, which had "gelatinous material on only the inside of the sock."

The district court's finding on the issue of materiality is supported by the evidence at the trial on remand. Given the Board's determination that corroboration was the dispositive issue, and in light of OWW's assertions before the PTO that there was no corroborating evidence for Mr. Comtesse's testimony, the district court's determination that the corroborating evidence was material to patentability is not clearly erroneous.

B

Specific intent to commit acts constituting inequitable conduct may be inferred from indirect and circumstantial evidence. *Therasense*, 649 F.3d at 1290. But deceptive intent must be "the single most reasonable inference drawn from the evidence." *Id.*

As to the evidence corroborating Mr. Comtesse's testimony, the court found that Mr. Colvin was aware of the 1999 Scalise letters and knew that their contents were consistent with Mr. Comtesse's testimony. For that reason, the court found that Mr. Colvin knew that evidence corroborating Mr. Comtesse was in OWW's possession. The court further found that Mr. Colvin understood from his counsel and from his experience before the PTO that he had a duty of candor separate and apart from his attorney's duty;[4] that he had the opportunity to correct

---

[4] The PTO imposes a duty of candor on "the patent owner, each attorney or agent who represents the patent owner, and every other individual who is substantively involved on behalf of the patent owner in a reexamination

the representations that OWW made to the Board regarding Mr. Comtesse's testimony; and that he took no action to correct those misrepresentations. Based on those subsidiary findings, the district court found that deceptive intent was demonstrated by clear and convincing evidence.

The evidence supports the district court's finding that Mr. Colvin's act of withholding the letters was the product of deceptive intent. It is clear from Mr. Colvin's testimony that he understood that the appeal to the Board in the second reexamination turned in substantial part on the question of corroboration. Mr. Colvin's testimony also reflects that he understood that he could have given his reexamination counsel the Scalise letters at any point but that he chose not to do so.

The court found that OWW offered no reasonable explanation for Mr. Colvin's conduct. Although Mr. Colvin knew that he was responsible for providing information in OWW's possession to his reexamination counsel, the court noted that Mr. Colvin had "no explanation for his failure to present [the letters]" to his reexamination counsel or the PTO. The court concluded that the most reasonable inference to be drawn from the evidence was that Mr. Colvin had acted with deceptive intent.

OWW suggests that Mr. Colvin did not correct the misrepresentation because he believed the Scalise letters were not prior art. The district court, however, reasonably found that OWW's explanation was not a valid excuse for his conduct. The record reflects that Mr. Colvin understood that corroboration and prior art were separate questions in the appeal. If Mr. Colvin had understood those questions to be the same, his belief as to what

_____

proceeding." 37 C.F.R. § 1.555(a); *see also* 37 C.F.R. § 1.56 (imposing a duty of candor in dealings with the PTO).

constituted prior art might be relevant. However, given his understanding that the issues were distinct, his opinion regarding whether the letters constituted prior art does not provide an explanation for his failure to disclose the letters as corroborative evidence. The district court's determination that deceptive intent was the most reasonable inference for Colvin's conduct is not clearly erroneous.

C

In addition to the Scalise letters, the district court held that Mr. Colvin was guilty of inequitable conduct in the second reexamination by withholding the 2006 declarations from the PTO. OWW argues that Mr. Colvin was unaware of those declarations because they were contained in a summary judgment motion in the district court litigation that was filed under seal and was subject to a protective order. Mr. Colvin testified that he believed he was not entitled to read the sealed materials and therefore did not read the summary judgment motion or the attached declarations.

The district court found Mr. Colvin's testimony on that point not to be credible, as the protective order did not bar OWW employees such as Mr. Colvin from viewing sealed materials (other than those denominated for attorneys' eyes only). The court found that it was "inconceivable that the OWW representative responsible for litigation involving the '237 patent—the commercial embodiment of which . . . was OWW's best-selling product—would not review the portions of Alps's summary judgment motion and exhibits not designated as 'attorney's eyes only,'" or otherwise designated as confidential. The court therefore found that as of 2006 Mr. Colvin knew that the three prosthetists, who had no apparent connection to Mr. Comtesse, "had corroborated his testimony that Silipos

manufactured and sold a version of the SSGL that did not allow gel bleed-through prior to March 5, 1995."

Viewing the record as a whole, we disagree with the district court that there was clear and convincing evidence that Mr. Colvin was aware of the 2006 declarations. No witness testified that Mr. Colvin saw the 2006 declarations or learned of their contents. Mr. Colvin testified that he believed he had never seen the declarations and was only told about the basis for the summary judgment motion "in general terms." He testified that he was told only that "there were some declarations that supported the [summary judgment] motion and that it was filed under seal."

Both of the litigation attorneys for OWW testified that they understood that the entire appendix of the summary judgment motion, which included the declarations, was confidential and could not be shared with Mr. Colvin. Moreover, one of the litigation attorneys testified that the appendix to the summary judgment motion consisted of a single bound volume, and that he had never separated the materials specifically marked as confidential from other materials in that volume.

In light of the high standard of proof required to establish the intent prong of inequitable conduct, we conclude that the evidence of Mr. Colvin's role in supervising the litigation was not sufficient under the circumstances to establish that he was familiar with the 2006 declarations, even in light of the district court's credibility judgment regarding Mr. Colvin. In analogous situations, this court has held circumstantial evidence of the sort at issue in this case to be insufficient to meet the "clear and convincing evidence" standard for inequitable conduct, even when the district court has made credibility findings against the party charged with inequitable conduct. *See 1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367 (Fed. Cir. 2012); *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537

F.3d 1357 (Fed. Cir. 2008). Based on the failure of proof, we hold that Alps failed to show that Mr. Colvin acted with deceptive intent in concealing those declarations from the PTO or that deceptive intent was the single most reasonable inference to draw from his conduct.

In sum, we uphold the district court's findings regarding Mr. Colvin's failure to call the Scalise letters to the PTO's attention in the second reexamination. Based on those findings, we hold that the district court did not abuse its discretion in determining that Mr. Colvin was guilty of inequitable conduct in the second reexamination.

## III

### A

In its cross-appeal, Alps argues that the district court erred by finding no inequitable conduct during the first reexamination.[5] Alps contends that the district court's conclusion with respect to the first reexamination conflicts with its conclusion regarding the second reexamina-

---

[5] OWW argues that Alps's challenge to the district court's ruling on the first reexamination is not a proper subject for a cross-appeal because its argument, if successful, would merely provide an alternative ground for affirmance of the judgment of unenforceability. We disagree. A cross-appeal is the proper way to proceed if the cross-appellant is seeking to lessen the rights of its adversary or enlarge its own rights. *See El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999); *Bailey v. Dart Container Corp.*, 292 F.3d 1360, 1362 (Fed. Cir. 2002). A judgment of unenforceability based on both the first and second reexaminations would expose OWW to a larger attorney fee award than a judgment based on the second reexamination alone. It was therefore proper for Alps to press its argument as to the first reexamination by way of a cross-appeal.

tion.   We disagree.   The court's ruling regarding the second reexamination centered on Mr. Colvin's failure to correct OWW's misrepresentations to the Board concerning the purported absence of corroborating evidence for Mr. Comtesse's testimony.   No such misrepresentations were made during the first reexamination.

The district court concluded that Alps failed to show that any of the items that it complained were not provided to the PTO in the course of the first reexamination were "but-for" material to that reexamination.   The court found that the Comtesse testimony was before the examiner in the first reexamination and that items that corroborated Mr. Comtesse's testimony were not material to the first reexamination.   After analyzing Alps's claims as to each item that it contends should have been disclosed to the examiner, the court concluded that "OWW did not withhold or misrepresent 'but-for' material information during the first reexamination proceedings."   We hold that those findings are not clearly erroneous, and we therefore reject Alps's contention that the court's differing conclusions with respect to the two reexaminations cannot stand.

B

Alps also appeals from the district court's decision not to extend the determination of unenforceability beyond the '237 patent to at least two of the related OWW patents, U.S. Patent Nos. 6,964,688 and 7,291,182.   The district court did not err in that regard.   As the district court noted, those patents have never been at issue in this litigation, and Alps did not request in its counterclaim the sweeping relief that it now asks us to direct the district court to grant.   Moreover, because different evidence may be pertinent to a claim of inequitable conduct directed to those other patents, the district court properly ruled that the findings that would be necessary to hold those patents unenforceable would go "beyond the scope of evidence

presented in this case." The district court's refusal to extend the unenforceability holding in these circumstances is appropriately within its discretion and is not in error.

We therefore affirm the district court's decision that the '237 patent is unenforceable for inequitable conduct in connection with the second reexamination, but not in connection with the first. We also affirm the district court's decisions with respect to the appropriate remedy.

Each party shall bear its own costs for these appeals.

**AFFIRMED**